UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DUKE ENERGY INTERNATIONAL, | § | |
| L.L.C. *et al.*, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-2408 |
| | § | |
| MICHAEL J. NAPOLI, *et al*,. | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER
## ON MOTIONS TO DISMISS

## CONTENTS

I.     BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

II.    RULE 12(b)(6) STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

III.   ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

     A.    Choice of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
     B.    Aiding and Abetting Breach of Fiduciary Duty . . . . . . . . . . . . .  9
          1.    The Existence of a Fiduciary Duty between
               Napoli/Torre and Duke . . . . . . . . . . . . . . . . . . . . . . . .  9
          2.    The Existence of the Cause of Action Under
               North Carolina Law . . . . . . . . . . . . . . . . . . . . . . . . . .  14
     C.    Belyea Defendants' Arguments . . . . . . . . . . . . . . . . . . . . . . .  15
          1.    Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15
          2.    Other Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
     D.    Wabash's Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
          1.    Aiding and Abetting Breach of Fiduciary Duty or
               Participation in Breach of Fiduciary Duty . . . . . . . . . . .  22
          2.    Partnership or Joint Venture Liability . . . . . . . . . . . . . .  25
          3.    Civil Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28
     E.    Unjust Enrichment Claim . . . . . . . . . . . . . . . . . . . . . . . . . . .  29
     F.    North Carolina Statutory Claim . . . . . . . . . . . . . . . . . . . . . .  31
     G.    Personal Jurisdiction over Peter Zinman, L.S. Belyea,
         and Michael Edwards . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36
     H.    Venue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45
     I.    Claims Against Gas Turbine . . . . . . . . . . . . . . . . . . . . . . . . .  47

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  47

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DUKE ENERGY INTERNATIONAL,  §
L.L.C. *et al.*,  §
     Plaintiffs,  §
 §
v.  §      CIVIL ACTION NO. H-09-2408
 §
MICHAEL J. NAPOLI, *et al,*.  §
     Defendants.  §

## MEMORANDUM AND ORDER
## ON MOTIONS TO DISMISS

Pending before the Court are three Motions to Dismiss.  Defendants Japan, Inc. ("Japan"), Gas Turbine Controls Corporation ("Gas Turbine"), Michael Zinman, Peter Zinman, and Michael Napoli (collectively, the "Japan Defendants") filed a Motion to Dismiss [Doc. # 113] ("Japan Defendants' Motion").  Defendants Michael Edwards, L.S. Belyea, and Belyea Company, Inc. ("Belyea") (collectively, the "Belyea Defendants") also filed a Motion to Dismiss [Doc. # 112] ("Belyea Defendants' Motion").  Defendant Wabash Power ("Wabash") filed a Motion to Dismiss as well [Doc. # 116] ("Wabash's Motion").  Plaintiffs Duke Energy International, L.L.C. ("DEI"), Duke Energy International Guatemala Holdings No. 1, Ltd. ("DEI-GT"), and Duke Energy International Group,  Ltd. ("DEIG") (collectively, "Duke") filed a

Response [Doc. # 120].[1]  Each group of Defendants filed a Reply.[2]  Having carefully considered the parties' submissions, applicable legal authorities, and all pertinent matters of record, the Court **grants in part** and **denies in part** Defendants' Motions.

## I.  BACKGROUND

Duke alleges that Defendants formed a partnership with two Duke insiders to take from Duke an opportunity to purchase a power plant and then sold the plant to Duke at a grossly inflated price.  The relevant facts, taken from Duke's allegations in the Third Amended Complaint [Doc. # 100] ("Complaint"), are briefly set forth below.

Duke alleges that two of its former senior executives, Joseph Napoli ("Napoli") and Julio Torre, DEI's Vice President of Business Development and Vice President of Regional Operations, respectively, formed a company called Artale Holding S.A. ("Artale") during their employment with Duke.[3]  Artale, the existence of which Napoli and Torre kept secret from Duke, was formed for the purpose of pursuing electric

---

[1]    Embedded in Duke's 63-page Response is a Motion for Leave to Exceed Page Limit ("Motion for Leave").  The Court **grants** the Motion for Leave, but cautions Duke that any future motions to exceed page limits must be filed as a distinct motion.

[2]    *See* Japan Defendants' Reply [Doc. # 124]; Belyea Defendants' Reply [Doc. # 123]; Wabash's Reply [Doc. # 125].

[3]    Joseph Napoli, Torre, and Artale are *not* defendants in this action.  Michael Napoli, however, is a Defendant.  In this Memorandum, "Napoli" refers to Joseph Napoli.

power projects and acquisitions, the same business in which Duke was and is engaged. During their employment with Duke, Napoli and Torre learned of an opportunity to purchase an 80 MW power plant in North Carolina from R.J. Reynolds Tobacco Company ("RJR").  Duke alleges that Napoli and Torre then seized this corporate opportunity and acquired the right to purchase the power plant through their company Artale.  Duke alleges that Napoli and Torre did so with the intention of assigning that right to a partnership of Belyea, Japan, Gas Turbine, and Wabash, which companies would also serve as middle men in subsequently selling the power plant to Duke. These corporate Defendants also provided financing for Artale's acquisition.  With the Defendants' assistance, Artale executed a purchase agreement for the plant with RJR on August 17, 2007, at a price of $2.5 million ("RJR Agreement").[4]

One week later, on August 24, 2007, Artale assigned the RJR Agreement to Belyea, which was acting on behalf of a partnership of all the corporate Defendants. Contemporaneously with the assignment, Belyea and Artale executed a Memorandum of Understanding that was to "govern the future relationship of Artale and Belyea as it pertains to the [RJR] Agreement."[5]  Among other things, the Memorandum of Understanding provided that "the parties wish to jointly market and sell [the power

---

[4]      Complaint, ¶ 25.

[5]      *Id.*, ¶ 28.

3

plant] to a third party."[6]   The Memorandum of Understanding also set forth a profit-sharing arrangement between Belyea and Artale.   Under this arrangement, Artale would receive a substantially higher payment if the facility was sold to Duke than if it was sold to any other buyer.[7] It is alleged that Defendants thereafter marketed the power plant to Duke while concealing Artale's, and thus Napoli and Torre's, role in Belyea's acquisition of the right to purchase the plant.

With Napoli and Torre using their status as Duke insiders to both influence Duke to purchase the plant and to provide Defendants with insider information on Duke's perspective on the negotiations, Defendants succeeded in selling the power plant to Duke for $21.3 million on February 5, 2008 (pursuant to what hereafter is referred to as the "Purchase Agreement").[8] This sale to Duke was less than six months after Artale had acquired the right to purchase the plant for only $2.5 million.

Duke brings claims against all Defendants for inducement and participation in—or aiding and abetting—breach of fiduciary duties ("aiding and abetting breach of fiduciary duties"); unjust enrichment; common law fraud; unfair or deceptive acts under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. GEN. STAT.

---

[6]     *Id.*, ¶ 29.

[7]     *Id.*

[8]     Purchase Agreement, Exh. 1 to Belyea Defendants' Motion.

§ 75-1.1; civil conspiracy; partnership, joint venture and joint enterprise liability; and

participatory liability for tortious conduct. Collectively, Defendants move to dismiss

all claims.[9]

## II.   <u>RULE 12(b)(6) STANDARD</u>

Traditionally, courts hold that a motion to dismiss under Rule 12(b)(6) of the

Federal Rules of Civil Procedure for failure to state a claim is viewed with disfavor

and is rarely granted.  *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir.

2009); *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005).

The Supreme Court has explained that in considering a motion to dismiss under Rule

12(b)(6), a complaint must be liberally construed in favor of the plaintiff and all well-

pleaded facts taken as true.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009);

*Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[A] judge must accept as true all of the

factual allegations contained in the complaint." (citing *Bell Atlantic Corp. v. Twombly*,

550 U.S. 544, 555–56 (2007) (internal citations omitted))).   Nevertheless,

"[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." *Iqbal*, 120 S. Ct. at 1949 (citing *Twombly*, 550

U.S. at 555).  Legal conclusions "are not entitled to the assumption of truth."  *Id.* at

---

[9]      Defendants have incorporated each other's arguments to the extent applicable.

1950.  Legal conclusions "can provide the framework of a complaint," but they must be supported by factual allegations.  *Id.*[10]

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570).  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id.* at 1950.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 1949 (citing *Twombly*, 550 U.S. at 556).  The determination of "whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 1950.  "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Id.* (quoting FED. R. CIV. P. 8(a)(2)).[11]  "Factual allegations must

---

[10]     "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Iqbal*, 120 S. Ct. at 1949.

[11]     "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556).

be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (internal citations omitted).  It is insufficient to plead facts that are "merely consistent with" a defendant's liability.  *See Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, a court ordinarily must limit itself to the contents of the pleadings and attachments thereto.  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (citing FED. R. CIV. P. 12(b)(6)).  "Documents that a defendant attaches to a motion to dismiss are [also] considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim."  *Id.* (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)); *see also Kane Enters. v. MacGregor (USA), Inc.*, 322 F.3d 371, 374 (5th Cir. 2003).  "In so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated."  *Collins*, 224 F.3d at 499.  These presumably are documents whose authenticity no party questions.

## III.   ANALYSIS

### A.   Choice of Law

Both the Belyea Defendants and the Japan Defendants assert that North Carolina law should apply to Plaintiffs' claims because of a choice of law clause in the Purchase Agreement.[12]   Wabash, citing only Texas authorities, states that it "reserves the right to challenge the application of North Carolina law to this dispute."[13]   Plaintiffs essentially demur.[14]   The parties cite cases from both North Carolina and Texas.   Given the limited record in this case, the Court does not make a global choice of law decision.   Indeed, the choice may vary depending on the claim.   Moreover, the parties have not fully joined issue on these matters.   The Court determines the pleading adequacy of each claim to the extent possible under the laws of all the states briefed by the parties.

## B.   Aiding and Abetting Breach of Fiduciary Duty

Duke brings a claim against all Defendants for aiding and abetting Napoli and Torre's breach of their fiduciary duty to Duke.   All Defendants seek dismissal of the

---

[12]   The choice of law clause provides: "All questions and disputes relating to the execution, construction, performance, or enforcement of this Agreement shall be determined in accordance with the laws of North Carolina."  Purchase Agreement, Exh. 1 to Belyea Defendants' Motion, ¶ 20.

[13]   Wabash's Motion, at 3 n.2.

[14]   As discussed below, Plaintiffs do, however, assert that Delaware law applies to their breach of fiduciary duty claim pursuant to the "internal affairs doctrine."

claim, but assert various grounds or theories. The parties have briefed North Carolina,

Texas, and Delaware law.[15]

### 1.    The Existence of a Fiduciary Duty between Napoli/Torre and Duke

As a predicate to Duke's claim that Defendants aided and abetted a breach of

fiduciary duty by Napoli and Torre, Duke needs to establish that such a fiduciary duty

existed.  All Defendants argue that Plaintiffs have failed to plead sufficient facts to

establish that Napoli and Torre owed a fiduciary duty to Duke.  Thus, Defendants

contend, Duke cannot state a claim for aiding and abetting the breach of a duty that

did not exist in the first place.  The Court disagrees with Defendants that Duke has

failed to plead facts sufficient to establish that Napoli and Torre owed a fiduciary duty

under the laws of North Carolina and Texas.

Under North Carolina law, a fiduciary relationship "has been broadly defined

. . . as one in which there has been a special confidence reposed in one who in equity

---

[15]     Duke argues that because DEI is a Delaware entity, Delaware law applies to the aiding and abetting fiduciary duty claim pursuant to the "internal affairs doctrine." *See Atherton v. F.D.I.C.*, 519 U.S. 213, 224 (1997). The internal affairs doctrine is "'a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands.'" *Id.* (citing Restatement (Second) Conflict of Laws § 309).  The Japan and Belyea Defendants, noting that DEI is not the entity that actually purchased the power plant or entered any agreements related to the purchase, disagree.  As noted, the Court declines to make a choice of law determination at this time.

and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence . . . , and it extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and resulting *domination and influence on the other.*" *Dalton v. Camp*, 548 S.E.2d 704, 707 (N.C. 2001) (emphasis in the original, internal quotation marks and brackets omitted) (citing *Abbitt v. Gregory*, 160 S.E. 896, 906 (1931)).  "However, the broad parameters accorded the term have been specifically limited in the context of employment situations.  Under the general rule, 'the relation of employer and employee is not one of those regarded as confidential.'" *Id.* (quoting *King v. Atlantic Coast Line R.R. Co.*, 72 S.E. 801 (1911)).  North Carolina courts generally find two types of fiduciary relationship: "(1) those that arise from 'legal relations such as attorney and client, broker and client, principal and agent, trustee and *cestui que* trust,' and (2) those that exist 'as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other.'"  *Rhone-Poulenc Argo S.A. v.. Monsato Co.*, 73 F.Supp.2d 540, 545 (M.D. N.C. 1999) (quoting *Abbitt*, 160 S.E. at 906).  In those situations in which the relationship is less clearly defined, "the question whether a fiduciary relationship exists is more open and depends ultimately on the circumstances.  Courts have historically declined to offer a rigid definition of a fiduciary relationship in order to allow imposition of fiduciary duties where

justified." *HAJMM Co. v. House of Raeford Farms, Inc.,* 403 S.E.2d 483, 489 (N.C. 1991); *see also Powell v. Omli*, 429 S.E.2d 774, 779 (N.C. App. 1993) (existence of fiduciary duty is a question of fact), *accord Smith v. GMAC Mortg. Corp.*, 2007 WL 2593148, at *6 (W.D.N.C. Sep. 7, 2007).

Under Texas law, fiduciary duties arise as a matter of law in certain formal relationships. *See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 593–94 (Tex. 1992) (noting that a fiduciary duty exists in agency and partnership relationships). Corporate officers owe fiduciary duties to the corporations they serve. *Loy v. Harter*, 128 S.W.3d 397, 407 (Tex. App.—Texarkana 2004, pet. denied) (citing *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567 (Tex. 1963)). Texas courts also recognize certain informal relationships, termed "confidential relationships" may give rise to a fiduciary duty. *Crim Truck & Tractor*, 823 S.W.2d at 594. "Because not every relationship involving a high degree of trust and confidence rises to the stature of a formal fiduciary relationship, the law recognizes the existence of confidential relationships in those cases 'in which influence has been acquired and abused, in which confidence has been reposed and betrayed.'" *Id.* (quoting *Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980)). As with North Carolina law, under Texas law the question of a whether a fiduciary

relationship exists is a question of fact and must be determined in light of all the attendant circumstances. *See Crim Truck & Tractor Co.*, 823 S.W.2d at 594.

The existence of a fiduciary duty is dependent in part on the degree of influence that Napoli and Torre exerted over the pertinent Duke entities and the extent to which they were authorized to act on those entities' behalf. *See Dalton,* 548 S.E.2d at 707; *Crim Truck & Tractor*, 823 S.W.2d at 594. Plaintiffs have pleaded facts sufficient to survive a motion to dismiss on the issue of whether Napoli and Torre owed a fiduciary duty to Duke with regard to the transaction in issue under either North Carolina or Texas law. The Complaint alleges that Napoli and Torre were both executives at DEI with significant responsibilities for Duke's Central and Latin American business; that they were secretly involved in Artale and would profit from the sale of the plant to Duke; that Torre was President of DEI-GT[16] and Napoli was an officer of DEIG, which paid $15.3 million to Belyea for the plant; and that Napoli and Torre were intimately involved in DEI's decision-making process regarding the plant's purchase.[17] These allegations are sufficient under North Carolina and Texas law to establish a fiduciary relationship between Napoli and Torre with DEI or others for purposes of a motion to dismiss.

---

[16]    Additionally, the Complaint alleges that Torre executed an exclusivity agreement as President of DEI-GT.

[17]    Complaint, ¶¶ 36, 37, 38, 39, 41, 42, 43, 44.

Wabash also argues that even if Napoli and Torre owed fiduciary duties to DEI, these duties are not at issue in this case because it was DEI-GT that actually purchased the power plant. Discovery is necessary to determine the scope of duties owed by Napoli and Torre and to identify the entities to which any such duties ran. The Court cannot determine on this record the relationship of the various Duke entities to each other or the full extent of the roles that these various entities played in the acquisition of the plant. For example, although it appears that DEI did not enter into any agreements relating to the power plant transaction, or make any payments to Belyea, the entities that did take such actions, DEI-GT and DEIG, respectively, are both DEI's wholly-owned subsidiaries. The record does not disclose when DEI-GT and DEIG were created and whether they were created solely for the purchase of the power plant. Those companies' relationship with DEI, *i.e.*, whether DEI controlled their decisions in pertinent respects, also is unclear. The Court will not dismiss Duke's aiding and abetting breach of fiduciary duty claim on this basis at this time.

> **2.**   **The Existence of the Cause of Action Under North Carolina Law**

The Japan and Belyea Defendants also argue that North Carolina does not recognize a claim for aiding and abetting breach of fiduciary duty. These Defendants rely primarily on *Laws v. Priority Trustee Servs. of N.C.*, 610 F.Supp.2d 528, 532 (W.D.N.C. 2009). In that case, the court, in an alternative holding, held that a cause

of action for aiding and abetting breach of fiduciary duty does not exist under North Carolina law.  *Laws*, 610 F.Supp.2d at 523.  The *Laws* court stated that the North Carolina Supreme Court has never recognized such a claim.  The *Laws* court explains that the rationale of an intermediate North Carolina state court of appeals to do so, *Blow v. Shaughnessy*, 364 S.E.2d 444, 447-48 (N.C. Ct. App. 1988), in a case involving securities fraud, "was eliminated by the Unites States Supreme Court in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994)." Duke counters citing several bankruptcy cases, all decided by Bankruptcy Judge William Stocks, holding that North Carolina would still recognize a cause of action for aiding and abetting breach of fiduciary duty after *Central Bank of Denver*.  *See, e.g.*, *In re EBD Laser, Inc.*, 2008 WL 1805575, at *1 (Bankr. M.D.N.C. Apr. 21, 2008).[18]   This Court's own research reveals that whether North Carolina law recognizes this cause of action remains an open question.  *See, e.g.*, *In re Bostic Const., Inc.*, 2010 WL 2598253, at *15 (Bankr. M.D.N.C. Jun. 25, 2010) (noting the lack of clarity as to the existence of a claim for aiding and abetting breach of fiduciary duty after *Central Bank of Denver* and collecting authorities); *see also Battleground Veterinary Hosp., P.C. v. McGeough*, 2007 WL 3071618, at *7 (N.C. Super. Ct. Oct. 19, 2007) ("It remains an open question whether North Carolina law recognizes a

---

[18]      *See* Response, at 25-26.

claim for aiding and abetting breach of fiduciary duty."). This Court cannot conclude as a matter of law that there is no legally viable claim under North Carolina law for aiding and abetting a breach of fiduciary duty.[19]

### C.   Belyea Defendants' Arguments

#### 1.   Fraud

The Belyea Defendants argue that Duke's fraud claim against them should be dismissed because provisions in the Purchase Agreement between Belyea and Duke disclaimed reliance on any misrepresentations by Belyea and agreed to accept the power plant "as is." Further, the Belyea Defendants contend, by entering into the exclusivity agreements, Duke negotiated for an exclusive period of time in which they could inspect the power plant and decide whether to purchase it. The Purchase Agreement's "as is" clause cited by Belyea provides:

> EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE IN THIS AGREEMENT, THE ASSETS ARE SOLD "AS IS" and "WHERE IS" WITHOUT ANY WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. In no event will SELLER be liable to PURCHASER or any third party for any kind of damages, including but not limited to special, incidental, or consequential damages arising out of PURCHASER's dismantling and removal from the Plant,

---

[19]   Wabash's Motion urges an additional ground for dismissal of Duke's claim for aiding and abetting breach of fiduciary duty. This argument is discussed *infra* Section III.D.1.

transportation and ownership of the Assets, even if the SELLER has been advised of such potential damages.[20]

The Purchase Agreement also contains a merger clause that provides:

> This Agreement and the Bill of Sale set forth the entire agreement between the parties hereto with respect to the subject matter hereof and revoke any prior agreements, and there are no other understandings. All amendments must be in writing, signed by both parties.[21]

The Court is not persuaded that either the cited contractual provisions or Duke's ability to inspect the power plant forecloses as a matter of law Duke's fraud claim in this case.  Under Texas law, "[a] buyer is not bound by an agreement to purchase something 'as is' that he is induced to make because of a fraudulent representation or concealment of information by the seller."  *See Prudential Ins. Co. of America v. Jefferson Associates, Ltd.*, 896 S.W.2d 156, 162 (Tex. 1995) (citing *Weitzel v. Barnes*, 691 S.W.2d 598, 601 (Tex. 1985); *Dallas Farm Mach. Co. v. Reaves*, 307 S.W.2d 233, 240 (Tex.1957)).  As a general principle under Texas law, "'a merger clause can be avoided based on fraud in the inducement and that the parol evidence rule does not bar proof of such fraud.'"  *Armstrong v. American Home Shield Corp.,* 333 F.3d 566, 571 (5th Cir. 2003) (quoting *Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171, 179 (Tex. 1997)).  However, a "disclaimer of reliance on representations, 'where

---

[20]    Purchase Agreement, at 7.

[21]    *Id.* at 24.

the parties' intent is clear and specific, should be effective to negate a fraudulent inducement claim.'" *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 56 (Tex. 2008) (quoting *Schlumberger*, 959 S.W.2d at 179). "Courts must always examine the contract itself and the totality of the circumstances when determining if a waiver-of-reliance provision is binding." *Id.* at 60.

Duke's claims do not involve malfunctioning of the plant or its unsuitability, topics to which the "as is" clause and right of inspection relate. Nor does Duke's fraud theory relate to prior or side agreements with Defendants. Rather, Duke alleges simple fraud – it paid well more than the sum for which it could have obtained the plant but for the duplicitous conduct of Torre, Napoli and the Defendants.[22]   The Complaint also alleges that Defendants affirmatively concealed the involvement of Napoli and Torre in selling the plant to Duke.[23]   Duke alleges that it never would have agreed to purchase the plant if it had known that two of its insiders, who played a role in Duke's decision to go forward with the acquisition, stood to secretly profit

---

[22]     *See, e.g.*, Complaint, ¶ 115.  More specifically, Duke alleges that it was fraudulently induced into purchasing the power plant at an inflated price by *inter alia* Defendants' misrepresentations that Belyea acquired the power plant directly from RJR, when in fact it acquired the right to purchase the plant from Artale, which is owned by Duke executives.

[23]     *See, e.g.*, *id.*, ¶ 116.

personally from the deal.[24]  In light of these theories, the Court cannot conclude as a matter of law at this point that the cited provisions in the Purchase Agreement preclude Duke's success on the reliance element of a fraud claim as a matter of law.

The cases on which Belyea relies do not suggest a different result.  *See Forest Oil*, 268 S.W.3d at 61; *Schlumberger*, 959 S.W.2d at 179.  Both cases involved broad and virtually identical waiver-of-reliance provisions.[25]  Both cases also involved parties attempting to set aside settlement agreements—"agreement[s] highly favored by the law."  *See Forest Oil*, 268 S.W.3d at 60; *Schlumberger*, 959 S.W.2d at 180 (noting that sole purpose of the agreement in issue was to "end the dispute . . . once

---

[24]     *Id.*, ¶ 120.

[25]     The *Schlumberger* disclaimer, as recited in *Forest Oil*, provided:

> [E]ach of us [the Swansons] expressly warrants and represents and does hereby state ... and represent ... that no promise or agreement which is not herein expressed has been made to him or her in executing this release, and that *none of us is relying upon any statement or representation of any agent of the parties being released hereby. Each of us is relying on his or her own judgment* and each has been represented by Hubert Johnson as legal counsel in this matter. The aforesaid legal counsel has read and explained to each of us the entire contents of this Release in Full, as well as the legal consequences of this Release ....

*See Forest Oil*, 268 S.W.2d at 57 (emphasis in original (quoting *Schlumberger*, 979 S.W.2d at 180)).

and for all").  Importantly, in holding that the waiver-of-reliance provisions barred fraudulent inducement claims, the Texas Supreme Court emphasized that one of the key facts in both cases was that the parties dealt with each other at arm's length.  *See Forest Oil*, 268 S.W.3d at 51.  Finally, the Texas Supreme Court was clear in each decision that it did not announce a "per se rule that a disclaimer automatically precludes a fraudulent-inducement claim," but rather held merely that, on the records presented in those cases, such claims were barred.  *Forest Oil*, 268 S.W.3d at 61; *see also Schlumberger*, 959 S.W.2d at 181.

None of the *Forest Oil* and *Schlumberger* circumstances are present in the case at bar.  Here the contractual "as is" and merger provisions are different from, and not as all encompassing as, the release language in *Forest Oil* and *Schlumberger.*  This case does not involve a settlement agreement.  Most significantly, Duke alleges that essentially the Purchase Agreement was not in fact negotiated at arm's length, unlike the agreements in *Forest Oil* and *Schlumberger.*  Duke's allegations are taken as true for present purposes.  The Court cannot conclude as a matter of law that the  "as is" and merger clauses in the Purchase Agreement "clearly express[] the parties' intent to waive a fraudulent inducement claim."  *Schlumberger*, 959 S.W.2d at 181.

### 2.    Other Claims

The Belyea Defendants also move to dismiss Duke's claims of civil conspiracy; partnership, joint venture, and joint enterprise liability; and participatory liability for tortious conduct.  Basically, the Belyea Defendants argue that none of these claims can survive because each is derivative of Duke's other tort claims, *i.e.*, fraud and aiding and abetting breach of fiduciary duty, which Belyea has moved to dismiss.  The Court's holdings above denying Defendants' motion to dismiss Duke's claims regarding fraud and fiduciary duty defeat the motion to dismiss the derivative claims.

### D.    Wabash's Arguments

Duke alleges claims against Wabash (and others) for participation in breach of fiduciary duty, also referred to as aiding and abetting or inducement of breach of fiduciary duty.  Duke also alleges claims for partnership or joint venture liability and civil conspiracy against Wabash.  Wabash moves to dismiss these claims under Texas law.  Wabash argues that the Complaint does not allege any contact whatsoever between Wabash and Duke, much less that Wabash made any misrepresentations to Duke.  Further, Wabash contends, under Texas law, "in the absence of a duty to disclose, mere silence does not amount to fraud or misrepresentation, and a duty to disclose arises only where a fiduciary or confidential relationship exists."  *Imperial Premium Finance, Inc. v. Khoury*, 129 F.3d 347, 352 (5th Cir. 1997).  Wabash thus contends that because Duke has not alleged either that Wabash made any

misrepresentations or that Wabash had a fiduciary or confidential relationship with Duke, the fraud-like claims against Wabash must be dismissed.[26]

Duke counters that Wabash was a knowing participant in Defendants' and Napoli and Torre's scheme and thus is vicariously liable for their actions under a variety of theories. Wabash argues that Duke has not alleged sufficient facts to state a claim under any of these theories of imputed liability.

### 1. Aiding and Abetting Breach of Fiduciary Duty or Participation in Breach of Fiduciary Duty

Wabash first argues that Duke has failed to state a claim for aiding and abetting breach of fiduciary duty because Duke has not adequately alleged that Wabash knew

---

[26]    Wabash also argues that all Duke's claims "sound in fraud" and moves to dismiss each count of the Complaint for failure to plead with sufficient particularity under Federal Rule of Civil Procedure 9. Rule 9 of the Federal Rules of Civil Procedure requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED. R. CIV. P. 9(b); *see Leatherman v. Tarrant Cty. Narcotics Intelligence Unit*, 507 U.S. 163, 168-69 (1993); *Hart v. Bayer Corp.*, 199 F.3d 239, 247 n.6 (5th Cir. 2000). In particular, the pleadings should "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004) (quoting *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1997)). Rule 9(b) requires a plaintiff to allege the existence of facts sufficient to warrant the pleaded conclusion that fraud has occurred. *See In Re Haber Oil Co.*, 12 F.3d 426, 439 (5th Cir. 1994). To the extent Duke alleges theories against Wabash other than fraud, Rule 9(b) is inapplicable and Wabash's argument is rejected. Nevertheless, even under a heightened standard such as Rule 9(b), the Court concludes that Duke's allegations are sufficient for present Rule 12(b)(6) purposes.

that Napoli and Torre owed fiduciary duties to Duke and breached them.[27]   To

establish a claim for knowing participation in a breach of fiduciary duty under Texas

law, a plaintiff must assert: "(1) the existence of a fiduciary relationship; (2) that the

third party [*i.e.*, the defendant] knew of the fiduciary relationship; and (3) that the

third party was aware it was participating in the breach of that fiduciary relationship."

*Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007) (citing *Cox Tex.*

*Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 721-22 (Tex. App.—Austin 2001, pet.

denied.)).[28]

---

[27]   As stated above, the claim for aiding and abetting a breach of fiduciary duty is also
referred to as participation in a breach of fiduciary duty.  *See, e.g.*, *In re Schlotzsky's,
Inc.*, 351 B.R. 430 (Bkrtcy. W.D. Tex. 2006) ("Texas does not currently recognize a
claim for aiding and abetting breach of fiduciary duty, as such. Texas does recognize
a claim for knowing participation in breach of fiduciary duty, however.") (citing
*Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942));
*Kastner v. Jenkens & Gilchrist, P.C.*, 231 S.W.3d 571, 580 (Tex. App.–Dallas 2007)
("When a third party knowingly participates in the breach of a fiduciary duty, the
third party becomes a joint tortfeasor and is liable as such. A cause of action premised
on a contribution to a breach of fiduciary duty must involve the knowing participation
in such a breach.") (internal citation omitted) (citing, *inter alia*, *Kinzbach Tool*, 160
S.W.2d at 513-14; *Cox Tex. Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 722 (Tex.
App.–Austin 2001, pet. denied)).

[28]   Wabash also argues that Duke's claim for participatory liability in tortious conduct
should be dismissed because it requires a showing that the defendant had knowledge
that the tortfeasor is breaching a duty,  citing to *Juhl v. Airington*, 936 S.W.2d 640,
644 (Tex. 1996) (citing  RESTATEMENT (SECOND) OF TORTS § 876(b)).  Given the
holding above, Wabash's arguments do not merit dismissal of Duke's participatory
liability claim on this record.

Duke's allegations that Wabash had the requisite knowledge are sufficient to survive a motion to dismiss.  Duke alleges that Wabash, through its CEO, Richard Caitung, received communications from Joseph Napoli, both directly and through other Defendants, providing detailed inside information on the progress of negotiations with Duke.[29]  Wabash responds that these communications merely contained information that any "broker working in the power industry who was negotiating an arm's length transaction with Duke for the sale" of the power plant would have known.[30]  The Court is unpersuaded.  Duke's allegations demonstrate that the information Wabash received gave it key knowledge of pertinent matters about the proposed deal and, significantly, about Napoli's and Torre's roles.  Also, Duke has alleged other facts of a suspicious nature that permit an inference of Wabash's knowledge of the fraudulent scheme.  For example, Duke alleges that during the course of the transaction Michael Zinman sent an email to Caitung and other Defendants instructing them that "all, and I mean all, correspondence with Joe Napoli is [to be] addressed to jnapoli@artaleholding.com."[31]  Most significantly, Duke's Complaint alleges that Wabash's own records reflect that, in response to Wabash's

---

[29]     *See, e.g.*, Complaint, ¶¶ 69, 88, 91.

[30]     Wabash Reply, at 3-4.

[31]     Complaint, ¶ 84.

CEO Caitung asking how Napoli gets compensated, he was told that Napoli worked for Duke International [DEI] and he wanted 50% of the sale price to Duke and 10% of any other sale. The records allegedly reflect that the $18.5 million spread between the sale price of the facility by RJR of $2.5 million and the plan to offer it to Duke for approximately $22 million.[32] Accepting these allegations as true for purposes of this Motion, they are sufficient to conclude that Wabash knew of Napoli and Torre's insider status at Duke and were aware that the two were breaching duties to their employer through the power plant transaction. *See In Re Haber Oil Co.*, 12 F.3d 426, 439 (5th Cir. 1994). Accordingly, the contention that the Court should dismiss Duke's claims against Wabash for participatory liability for tortious conduct on this basis is rejected.

### 2.    Partnership or Joint Venture Liability

Wabash next argues that Duke has failed to plead a factual basis for holding Wabash liable for the acts of other Defendants under a partnership, joint venture, or joint enterprise theory. Under Texas law, "a partnership is liable for loss or injury to a person . . . incurred as a result of the wrongful act or omission or other actionable conduct of a partner acting: (1) in the ordinary course of business of the partnership, or (2) with the authority of the partnership." TEX. BUS. ORG. CODE § 152.303; *Kelsey-*

---

[32]    *Id.*, ¶¶ 76-77.

*Seybold Clinic v. Maclay*, 466 S.W.2d 716, 719 (Tex. 1977)*, superseded by statute on other grounds as stated in Helena Laboratories Corp. v. Snyder*, 886 S.W.2d 767 (Tex. 1994).

"An association of two or more persons to carry on a business for profit as owners creates a partnership, regardless of whether: (1) the persons intend to create a partnership; or (2) the association is called a 'partnership,' 'joint venture,' or other name." TEX. BUS. ORG. CODE § 152.303.  Texas courts look to the following factors in determining whether a partnership existed: (1) whether the parties agreed to share profits; (2) whether there were expressions of intent to be partners; (3) whether the parties had a right to control the business; (4) whether the parties agreed to share losses and liability for third-party claims, and (5) whether the parties contributed money or property to the business.  *See Ingram v. Deere*, 288 S.W.3d 886, 899-903 (Tex. 2009); *McDowell v. McDowell*, 143 S.W.3d 124, 129 (Tex. App.—San Antonio 2004, no pet.).  No factor is dispositive; "whether a partnership exists must be determined by the totality of the circumstances." *Ingram*, 288 S.W.3d at 904.

Similarly, joint enterprise liability makes each participating party "an agent to the other." *Texas Dept. of Transp. v. Able*, 35 S.W.3d 608, 613 (Tex. 2000).  As set forth by the Texas Supreme Court:

> The elements which are essential to a joint enterprise are commonly stated to be four: (1) an agreement, express or implied, among the

> members of the group; (2) a common purpose to be carried out by the
> group; (3) a community of pecuniary interest in that purpose, among the
> members; and (4) an equal right to a voice in the direction of the
> enterprise, which gives an equal right of control.

*Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 491 cmt. c). To establish the fourth

element of a joint enterprise, "each [participant] must have an authoritative voice or,

. . . must have some voice and right to be heard." *Id.* (quoting *Shoemaker v. Estate of*

*Whistler*, 513 S.W.2d 10, 16 (Tex. 1974)).

Wabash's specific contention is that Duke's allegations that it (Wabash) had a

sufficient voice in the control of the purported partnership/joint venture are conclusory

and insufficient to establish partnership, joint enterprise or agency/principal law

liability. The Court disagrees. Duke alleges that Wabash entered into a partnership,

joint venture or joint enterprise with Belyea, Japan, Gas Turbine and Artale "for the

purpose of concealing Artale's role in the [power plant] transaction, and to permit the

Partners to extract a grossly unfair price for [the power plant] from Duke through the

secret involvement of Duke officers Joseph Napoli and Julio Torre on both sides of

the transaction."[33] Duke alleges that Wabash, Belyea, and Japan/Gas Turbine each

contributed approximately $150,000 to the venture, and had a profit sharing

agreement whereby Artale would receive fifty percent of any sale to Duke at a price

---

[33]     Complaint, ¶ 17.

over $15 million, and Wabash, Belyea, and Japan/Gas Turbine would split the remaining half evenly.[34]    Duke also alleges that Wabash, Belyea and Japan/Gas Turbine represented to Duke that a "partnership" or "consortium" consisting of the three entities purchased the power plant from RJR, and that the corporate Defendants' own records also refer to their relationship as a "partnership" with regard to the disputed transaction.[35]    *See Ingram*, 288 S.W.3d at 900 (parties' holding themselves out as partners is evidence of intent to form partnership). Additionally, the Complaint alleges that the other members of the partnership/joint-venture solicited Wabash's CEO Caitung's input and requested his approval with regard to certain actions, and that Caitung had the right to get information or whatever he needed from the other partners.[36]    This "control" inquiry is necessarily fact intensive, but these allegations are sufficient to state a claim for Rule 12(b)(6) purposes that Wabash had "some voice

---

[34]    *Id.*, ¶ 51.

[35]    *Id.,* ¶ 52.

[36]    For instance, Duke has pleaded that Napoli and Torre circulated a draft letter to the Defendants, including Caitung, for input and approval. *Id.*, ¶ 78.  Duke also cites an email sent by L.S. Belyea instructing Caitung to "go through [Michael Edwards, L.S. Belyea] or [M]ichael Napoli if he needs anything," relating to the power plant transaction. *Id.*, ¶ 47.  An additional email sent from Michael Zinman to, among others, Caitung, stated that "Michael Napoli . . . should be the go to man on the project.  If anything is required, either for Duke or anyone else, it will make life much easier for all of us if it goes through him." *Id.*  Both of these emails were forwarded by L.S. Belyea to Caitung.  In response, a Wabash employee informed L.S. Belyea that "Richard [Caitung] is out of the office.  I read him the forwarded emails.  He agrees completely." *Id.*

and right to be heard" with regard to the transaction.  *See Texas Dept. of Transp. v.*

*Able*, 35 S.W.3d 608, 613 (Tex. 2000).[37]

### 3.    Civil Conspiracy

Duke has also pleaded sufficient facts to survive a motion to dismiss its civil

conspiracy claim against Wabash.  To prevail on a claim for civil conspiracy a

plaintiff must establish the following elements: "(1) a combination of two or more

persons; (2) an object to be accomplished (an unlawful purpose or a lawful purpose

by unlawful means) (3) a meeting of minds on the object or course of action; (4) one

or more unlawful, overt acts; and (5) damages as the proximate result." *Insurance Co.*

*of North America v. Morris*, 981 S.W.2d 667, 675 (Tex. 1998) (citing *Massey v.*

*Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983)).  On the grounds set forth earlier,

the Court rejects as unfounded Wabash's argument that Duke has failed to allege facts

supporting the inference that Wabash had actual knowledge of any purported scheme

to defraud Duke.

---

[37]    Wabash also alleges that even if Duke has pleaded sufficient facts to establish a partnership or joint enterprise theory, it is nonetheless not liable for the venture's action because it lacked knowledge regarding the partnership's purported fraudulent purpose.  *See* Wabash Reply, at 8.  However, as discussed *supra*, Duke has pleaded facts adequate to state a claim that Wabash knew of Napoli and Torre's important relationships to Duke and that the two were breaching duties to Duke in connection with the power plant transaction.  Consequently, the Court rejects Wabash's contention that Duke's pleading is insufficient to establish that it knew about the fraudulent purpose of the partnership or joint enterprise.

In sum, Duke has pleaded its claims against Wabash with sufficient particularity to survive a challenge under Rule 8, or Rule 9(b), should it apply.

### E.    Unjust Enrichment Claim

Defendants seek dismissal of Duke's claim for unjust enrichment under both Texas and North Carolina law.  Defendants contend that a plaintiff may not recover under a theory of unjust enrichment when the subject of the claim is covered by an express contract.  The Court agrees.[38]

Duke argues that when a contract is procured by fraud, as alleged here, a plaintiff may recover under an unjust enrichment theory despite the existence of an express contract.  However, Duke cites no authority under either Texas or North Carolina law for this proposition.[39]  Under Texas law, to the extent that Duke argues that the Purchase Agreement is void and that it may therefore proceed under a theory

---

[38]    *See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000) ("Generally speaking, when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory"); *Lagies v. Myers*, 542 S.E.2d 336, 345-46 (N.C. App. 2001) ("As to any claim by plaintiff that defendant was unjustly enriched by improvements or renovations to the property, plaintiff cannot recover under a theory of unjust enrichment because an express agreement concerning the improvements existed between the parties.") (citing *Whitfield v. Gilchrist*, 497 S.E.2d 412, 415 (N.C. 1998) ("Only in the absence of an express agreement of the parties will courts impose a quasi contract or a contract implied in law in order to prevent an unjust enrichment.")).

[39]    Although Duke cites to a case from the Northern District of Texas, the quotation relied upon by Duke is discussing California law, not Texas law.

of unjust enrichment, its argument fails.  "A contract induced by fraud is voidable, not void, and will be avoided only if the complaining party proves it has the right to avoid the contract."  *Buddy Gregg Motor Homes, Inc. v. Motor Vehicle Bd. of the Texas Dep't. of Transp.*, 179 S.W.3d 589, 602 (Tex. App.—Austin 2005, pet. denied) (citing *Swain v. Wiley College*, 74 S.W.3d 143, 146 (Tex. App.—Texarkana 2002, no pet.)). Further, "it is well settled that one who is induced by fraud to enter into a contract has his choice of remedies. He may stand to the bargain and recover damages for the fraud, or he may rescind the contract, and return the thing bought, and receive back what he paid."  *See Fortune Prod.*, 52 S.W.3d at 676 (quoting *Dallas Farm Machinery Co. v. Reaves*, 307 S.W.2d 233, 238-39 (1957) (internal quotation marks omitted)). A plaintiff seeking recovery under a voidable, but not void, instrument "cannot gain restitution through a suit for money had and received, but must sue for rescission of [the contract]."  *Country Cupboard, Inc. v. Texstar Corp.*, 570 S.W.2d 70, 74 (Tex. App.—Dallas 1978, writ ref'd n.r.e.).  Duke does not seek to rescind the Purchase Agreement and to give up the power plant.  Duke's unjust enrichment claim under Texas law is dismissed.

As for Duke's claim under North Carolina law, Duke has provided no citations or authority to suggest that any exception exists to the general rule in North Carolina barring recovery for unjust enrichment when an express contract covers the subject

matter at issue.  *See Whitfield*, 497 S.E.2d at 415; *Lagies*, 542 S.E.2d at 345-46.

Therefore, Duke's unjust enrichment claim under North Carolina law also is

dismissed.

### F.    North Carolina Statutory Claim

Defendants move to dismiss Duke's claim under the North Carolina Unfair and

Deceptive Trade Practices Act, N.C. GEN. STAT. § 75-1.1 ("NC UTPA" or "the Act").

The NC UTPA "prohibits '[u]nfair methods of competition' and 'unfair or deceptive

acts or practices' that are 'in or affecting commerce.'"  *Food Lion, Inc. v. Capital

Cities/ABC, Inc.*, 194 F.3d 505, 519 (4th Cir. 1999) (quoting N.C. Gen. Stat. 75-1-

1(a)).  "It gives a private cause of action to consumers aggrieved by unfair or

deceptive business practices."  *Id.* (citing *Marshall v. Miller*, 276 S.E.2d 397, 400

(N.C. 1981)).  Defendants argue that Duke has failed to state a claim under the NC

UTPA because its allegations in this case fall outside the scope of the Act.  The Court

agrees.

Although the NC UTPA's language is broad, "it is not intended to apply to all

wrongs in a business setting."  *Id.*  (citing *HAJMM Co. v. House of Raeford Farms,

Inc.*, 403 S.E.2d 483, 492 (N.C.1991)).  The Act's "primary purpose is to protect the

consuming public."  *Id.* (citing *Skinner v. E.F. Hutton & Co., Inc.*, 333 S.E.2d 236,

241 (N.C. 1985)).  Although "businesses are sometimes allowed to assert [NC] UTPA

claims against other businesses because 'unfair trade practices involving only businesses' can 'affect the consumer as well,'" *id.* at 519-20 (citing *United Labs., Inc. v. Kuykendall*, 370 S.E.2d 375, 389 (N.C. 1988)), "the fundamental purpose of the [NC] UTPA is to protect the consumer, and courts invariably look to that purpose in deciding whether the Act applies." *Id.* at 520 (citing *Lindner v. Durham Hosiery Mills, Inc.*, 761 F.2d 162, 165-67 (4th Cir. 1985)).

In light of this purpose, and considering federal Due Process and Commerce Clause concerns, courts limit the scope of the NC UTPA to cases where the allegedly wrongful conduct caused a "substantial effect on a plaintiff's in-state business operation." *'In' Porters, S.A. v. Hanes Printables, Inc.*, 663 F.Supp. 494, 501-02 (M.D.N.C. 1987); *Dixie Yarns, Inc. v. Plantation Knights, Inc.*, 1994 WL 910955, at *3 (W.D.N.C. Jul. 12, 1994); *see also Bondi v. Bank of Am. Corp. Bondi v. Bank of Am. Corp. (In re Parmalat Sec. Litig.)*, 383 F.Supp.2d 587, 601 (S.D.N.Y. 2005) ("the overwhelming majority of federal district courts to consider [this issue], most of which are in North Carolina, have limited Section 75-1.1's application to cases involving substantial effect on a plaintiff's in-state business operation").

Duke argues that the requirement that a plaintiff plead a substantial effect on its in-state business operations is only relevant to jurisdictional and conflicts of law analyses. In this connection, Duke contends that if the Court determines that the

choice of law clause in the Purchase Agreement mandates the application of North Carolina law, the NC UTPA will apply regardless of any in-state injury requirement. The Court disagrees.  The cited cases address the scope of the Act itself, not merely choice of law or jurisdictional issues.  Moreover, while Duke argues that the due process concerns that animate the limitation on the scope of the Act are not at issue here because Defendants signed a choice of law provision selecting North Carolina law, Duke completely fails to address the limitations on the NC UTPA pursuant to the Commerce Clause.  *See 'In' Porters*, 663 F.Supp. at 502 ("The court believes that limiting the scope of the act to cases involving substantial effect on a plaintiff's in-state business operation is consistent with, and perhaps required by, the commerce clause."); *cf. ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 48, n.9 (4th Cir. 1983) (noting that there was no cause for "constitutional concern" with the NC UTPA in the absence of some reason to believe that it is an attempt to directly regulate interstate commerce rather than being "designed to address primarily *local concerns*" (emphasis added)).  Moreover, it is clear that the touchstone of the NC UTPA is the protection of consumers in North Carolina.  *See Food Lion,* 194 F.3d at 520 (refusing to apply the NC UTPA to Defendant Food Lion's allegation that a reporter had engaged in deceptive conduct by posing as a job applicant at one of its stores in North Carolina because the misrepresentations did not harm the consuming public, but rather were

presumably intended to "benefit the consuming public by letting it know about Food Lion's food handling practices").  The Court follows these precedents.  A plaintiff who does not allege a substantial effect on in-state North Carolina operations fails to state a claim under the NC UTPA.  *See In re Parmalat*, 383 F.Supp.2d at 604 ("In the absence of a clear indication that the North Carolina legislature intended Section 75-1.1 to reach cases in which the plaintiff alleges no substantial effect on in-state business operations, this Court concludes that the complaint states no claim under the statute.").

Under this standard, Duke fails to state a claim under the NC UTPA.  Duke alleges that it suffered harm in both North Carolina and Texas.[40]  However, it is undisputed that Duke purchased the power plant for the express purpose of disassembling it and shipping it to Guatemala.  Indeed, the Purchase Agreement itself provides that "the purchase and sale of the Assets contemplated by this Agreement should be exempt from North Carolina sales or use tax as [Duke] is purchasing the Assets for the purpose of exporting the Assets to Guatemala."[41]  While Duke has alleged that the Plaintiff entities are direct and indirect subsidiaries of Duke Energy Corporation ("Duke Energy"), which is based in North Carolina, Duke Energy itself

---

[40]    Complaint, ¶ 124.

[41]    Purchase Agreement, Exh. 1 to Belyea Defendants' Motion, ¶ 2(d).

is not a plaintiff in this case.  Duke fails to explain how Duke Energy experienced

harm in North Carolina as a the result of the alleged wrongful conduct.  According to

the Complaint, the Duke entities that are Plaintiffs are neither incorporated in nor

based in North Carolina.[42]  Moreover, even if Duke could establish a substantial effect

on its North Carolina operations, Duke has alleged no facts showing harm to North

Carolina consumers.  *See Food Lion*, 194 F.3d at 520.  Duke's NC UTPA claim is

dismissed.

### G. Personal Jurisdiction over Peter Zinman, L.S. Belyea, and Michael Edwards

The Japan Defendants argue that the Court lacks personal jurisdiction over

Defendant Peter Zinman.  Similarly, the Belyea Defendants argue that the Court lacks

personal jurisdiction over the individual Belyea Defendants, Michael Edwards and

L.S. Belyea.  Duke contends that it has alleged facts sufficient to establish a *prima*

*facie* case of personal jurisdiction over these three individual Defendants.

Duke must establish contacts with the forum state by the nonresident defendant

sufficient to invoke the jurisdiction of this Court.  *See Mink v. AAAA Dev. LLC*, 190

F.3d 333, 335 (5th Cir. 1999).  When a court rules on a motion to dismiss for lack of

personal jurisdiction without holding an evidentiary hearing, the party asserting

---

[42]    *See* Complaint, ¶¶ 1-3.

jurisdiction is required to present facts sufficient to constitute a *prima facie* case of personal jurisdiction to satisfy its burden.  *Central Freight Lines Inc. v. APA Transport Corp.*, 322 F.3d 376, 380 (5th Cir. 2003); *Alpine View Co. v. Atlas Copco A.B.*, 205 F.3d 208, 214 (5th Cir. 2000); *see Brown v. Slenker*, 220 F.3d 411, 417 (5th Cir. 2000).  A *prima facie* showing of personal jurisdiction may be established by the pleadings, depositions, affidavits or exhibits of record.  *See Guidry v. U.S. Tobacco Co., Inc.*, 188 F.3d 619, 625 (5th Cir. 1999).  The Court must accept as true the party's uncontroverted allegations and resolve any factual conflicts in favor of the party seeking to invoke the court's jurisdiction.  *Central Freight Line Inc.*, 322 F.3d at 376; *Alpine View Co.*, 205 F.3d at 214; *Stripling v. Jordan Production Co.*, 234 F.3d 863 (5th Cir. 2000).  "Even if the court receives discovery materials, unless there is a full and fair hearing, it should not act as a fact finder and must construe all disputed facts in the plaintiff's favor and consider them along with the undisputed facts."  *Walk Haydel & Assocs. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008).  The law, however, does not require the court to credit conclusory allegations, even if uncontroverted.  *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 868-69 (5th Cir. 2001).

Under the Federal Rules of Civil Procedure, a federal court sitting in diversity may exercise jurisdiction over a nonresident defendant only if permitted under state

law.  *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 214 (5th Cir. 2000) (citing

FED. R. CIV. P. 4(e)(1), 4(h)(1), 4(k)(1)).  The reach of a state court's jurisdiction is

limited by: (1) the state's long-arm statute; and (2) the Due Process Clause of the

Fourteenth Amendment to the federal Constitution.  *Johnston v. Multidata Sys. Int'l*

*Corp.*, 523 F.3d 602, 609 (5th Cir. 2008) (citing *Cycles, Ltd. v. W.J. Digby, Inc.*, 889

F.2d 612, 616 (5th Cir. 1989)).  The Texas long-arm statute authorizes the exercise of

jurisdiction over non residents "doing business" in Texas.  *Gundle Lining Constr.*

*Corp. v. Adams County Asphalt, Inc.*, 85 F.3d 201, 204 (5th Cir. 1996) (citing  TEX.

CIV. PRAC. & REM. CODE  § 17.042). The Texas Supreme Court has interpreted the

"doing business" requirement broadly, allowing the long-arm statute to reach as far as

the federal Constitution permits.  *Id.* (citing *Schlobohm v. Schapiro*, 784 S.W.2d 355,

357 (Tex. 1990)).  Thus, the two-step inquiry collapses into one federal due process

analysis.  *Johnston*, 523 F.3d at 609.

The two-part test for assertion of personal jurisdiction under the due process

clause is (1) whether a defendant "purposefully availed itself of the benefits and

protections of the forum state by establishing 'minimum contacts' within the forum

state," and (2) whether the assertion of personal jurisdiction would comport with

"traditional notions of fair play and substantial justice." *Alpine View*, 205 F.3d at 215;

*see also Burger King Corp. v. Rudzewica*, 471 U.S. 462, 476-77 (1985).  Both prongs

of the due process test must be met in order for this Court to exercise personal jurisdiction over the defendant.

The "minimum contacts" requirements may be satisfied if either (1) the controversy is "related to" or "arises out of" the nonresident defendant's contacts with the forum ("specific jurisdiction"), or (2) the defendant has "continuous and systematic" contacts with the forum ("general jurisdiction").  *See Burger King*, 471 U.S. at 472-76; *Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408, 413-17 (1984); *Alpine View*, 205 F.3d at 215.

"Specific jurisdiction applies when a nonresident defendant 'has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities.'"  *See Walk*, 517 F.3d at 243 (quoting *Panda Brandywine*, 253 F.3d at 867).  The mere fact that a plaintiff suffered some harm in Texas, however, is insufficient to establish specific jurisdiction in this forum. *See Panda Brandywine*, 253 F.3d at 870; *Revell v. Lidov*, 317 F.3d 467, 473 and n.41 (5th Cir. 2002) (explaining that the "effects" test of *Calder v. Jones*, 465 U.S. 783 (1984), is but one facet of the ordinary minimum contacts analysis and is not inconsistent with requiring more than plaintiff's mere residence in the forum and suffering harm there).  "While generally insufficient alone to confer jurisdiction, 'the foreseeable effects of a tort' should be considered 'as *part* of the analysis of the

defendant's relevant contacts with the forum.'"  *Walk Haydel*, 517 F.3d at 245; (quoting *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 212 (5th Cir. 1999)).  The Fifth Circuit has held that "[w]hen the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment."  *Wien*, 195 F.3d at 213.  "The defendant [in such circumstance] is purposefully availing himself of 'the privilege of causing a consequence' in Texas."  *Id.* (citing *Serras v. First Tennessee Bank National Ass'n.*, 875 F.2d 1212 (6th Cir. 1989).

The conclusion that a defendant should "reasonably anticipate" being haled into the forum state requires "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws" or "purposefully directs" its efforts toward the forum state.  *Panda Brandywine*, 253 F.3d at 869 (quoting *Burger King*, 471 U.S. at 475-76)

Duke alleges that Peter Zinman, Edwards, and L.S. Belyea were active participants in the Defendants' scheme to defraud Duke and to encourage Napoli and Torre's breach of their fiduciary duties to Duke.  Peter Zinman prepared the Assignment and Memorandum of Understanding that established the framework for the Defendants' relationship with Artale and included the profit-sharing arrangement

whereby Artale would receive a higher percentage of the profit if the plant was sold to Duke.[43]  Edwards negotiated these agreements with Joseph Napoli.  The agreements were also discussed with, and signed by, L.S. Belyea.  Artale, as expressly set forth in the Assignment and Memorandum of Understanding, has its principal place of business in Houston, Texas.  Additionally, DEI, DEIG and DEI-GT all have their principal places of business in Houston, Texas.  Duke thus alleges that Napoli, a key player in the scheme, worked for both Artale and Duke in Houston and that Peter Zinmam, L.S. Belyea, and Edwards knew this fact when the agreements furthering the scheme among them were negotiated and signed.[44]

Duke further alleges that these three Defendants had contacts with Texas both through an ongoing relationship with Joseph Napoli and through contacts with Duke.

---

[43]   Deposition of Peter Zinman, Exh. A to Duke Response ("Peter Zinman Deposition"), at 61-62; 82-83.

[44]   Duke has also produced some documentary evidence to this effect.  *See* Assignment and Memorandum of Understanding, Exh. D to Duke Response (both documents list Artale's principal place of business as Houston and are signed by Joseph Napoli as President of Artale); Peter Zinman Deposition, at 57-58 (Peter Zinman knew that Joseph Napoli worked for Duke at the time of the transaction and had an office in Houston); Deposition of Michael Edwards, Exh. B to Duke Response ("Edwards Deposition"), at 51-52 (verifying Belyea records showing that Joseph Napoli worked for DEIG in Houston); Belyea Records, Exh. D to Duke Response, at 14 of 21 (screen shot of Joseph Napoli's contact information at DEIG showing a Houston area code for his phone number and containing the note "Joe Napoli moved to Houston, Tx").

None of the three deny that they had such contacts.[45]  As noted, Duke alleges that Defendants formed a continuing relationship with Artale, a Houston based company to "jointly market and sell [the power plant] to a third party."[46]  *Cf. Stuart v. Spademan*, 772 F.2d 1185, 1193 (5th Cir. 1985) (holding that an agreement entered into by an out-of-state defendant with a Texas plaintiff did not establish personal jurisdiction in Texas when the agreement did not contemplate a long-term relationship with "continuing obligations" and "wide-reaching contacts").  Moreover, Duke alleges that Defendants and Artale specifically targeted the Duke Plaintiffs, which are Houston based entities, for the sale.  Defendants targeted Duke because Napoli and Torre were positioned to induce Duke to purchase the plant and could also provide inside information to Defendants during negotiations in order to consummate the sale at an inflated price.  Duke alleges that some of these activities occurred in Houston.  Duke alleges that the individual Defendants' contacts with Texas were part of a scheme to defraud Duke and to encourage, aid, and abet Napoli and Torre's breach of fiduciary duties owed to Duke, and that the individual Defendants personally profited

---

[45]    Defendants argue that merely negotiating a contract with a resident of the forum state is insufficient to constitute purposeful availment of the benefits and protections of that state's law.  Duke does not contend that the Court has personal jurisdiction over the individual Defendants because of mere contract negotiations for Duke to purchase the plant.

[46]    Complaint, ¶ 29.

from the scheme.  *See Walk Haydel*, 517 F.3d at 243 ("[The defendant's] purposeful contacts with Louisiana, in combination with the foreseeable harmful effects in Louisiana of its allegedly illegal activity, makes specific jurisdiction proper."); *Wien*, 195 F.3d at 212.

Defendants argue, pursuant to the fiduciary shield doctrine, that all their contacts with Texas were in their corporate capacities, and thus cannot be used to confer jurisdiction over them personally.  However, this is not a breach of contract case.  The fiduciary shield doctrine is thus of no use to the individual Defendants.  *See Powerhouse Productions, Inc. v. Widgerysee*, 564 F. Supp. 2d 672, 678 (E.D. Tex. 2008) (fidcuiary shield doctrine inapplicable when individual defendant faces personal liability from tortious conduct alleged against him) (citing *Lewis v. Indian Springs Land Corp.*, 175 S.W.3d 906, 917 (Tex. App.—Dallas 2005, no pet.)) ("Corporate officers are not shielded from the exercise of specific jurisdiction for fraudulent or tortuous acts for which they may be liable."); *see also Lewis v. Fresne*, 252 F.3d 352, 359 n.6 (5th Cir. 2001) ("[T]he shield is removed if the individual's personal interests motivate his actions . . . ." (internal quotation marks removed)); *accord General Retail Services, Inc. v. Wireless Toyz Franchise, LLC,* 255 F. App'x 775, 794-95 (5th Cir. 2007) (fiduciary shield doctrine did not prohibit a defendant from being held liable for his own tortious conduct simply because he was an officer of a corporation).

Each of these Defendants also contends that he was only the *recipient* of communications with Texas during the transaction, and that they did not *initiate* any contacts with individuals in Texas.  First, this is not true as to, at least, Peter Zinman and Edwards, who each directed several emails into Texas.[47]  This evidence, and other proof of ongoing communications between Joseph Napoli and the individual Defendants, is probative in the circumstances of this case of the individual Defendants' purposefully contacting Napoli in Texas.

Equally unavailing is Defendants' reliance on the Texas Supreme Court's opinion in  *Michiana v. Easy Livin' Country, Inc.*, 168 S.W.3d 777 (Tex. 2005).  In *Michiana*, the Texas Supreme Court held that a Texas plaintiff's unsolicited phone call to an RV manufacturer in Indiana that did no business in Texas was insufficient to establish that the RV manufacturer purposefully availed itself of the benefits and protections of Texas law despite the fact that the plaintiff alleged that he purchased the RV based on misrepresentations made by the manufacturer during the call.  *Id.*

---

[47]     *See, e.g.*, Email of November 2, 2007, Exh. E16 to Duke Response (email sent from Peter Zinman to, *inter alia*, Joseph Napoli); Email Exchange of December 19, 2007, Exh E37 to Duke Response (email sent from Peter Zinman to, *inter alia*, Javier Gonzales, who, on an email sent to Peter Zinman earlier the same day, is listed as "Javier Gonzales, Assistant General Counsel, Duke Energy International" with a Houston phone number); Emails of November 6, 2007, Exh. E20 to Duke Response (email from Edwards to Herb Mills, Duke Energy International representative; email from Edwards to group including L.S. Belyea and Joseph Napoli); *see also* Deposition of L.S. Belyea, Exh. C to Duke Response, at 25 (L.S. Belyea participated in conference calls with Joseph Napoli).

Here, unlike in *Michiana*, Plaintiffs allege that Defendants entered into a tortious scheme that specifically targeted Duke because Napoli and Torre were Duke insiders who could induce Duke to purchase the plant at an inflated price. Duke alleges that this scheme involved a continuing relationship between Defendants and Artale, and ongoing communications between Defendants and both Artale and Duke in Texas. Duke's allegations are sufficient to establish a *prima facie* case that the individual Defendants purposefully availed themselves of the benefits and protections of Texas law.

Having determined that Peter Zinman, Edwards and L.S. Belyea purposefully established sufficient minimum contacts with Texas relating to this suit, the Court also holds that "traditional notions of fair play and substantial justice" would not be offended by the exercise of jurisdiction over these Defendants. *See Alpine View*, 205 F.3d at 215; *see also Burger King Corp,* 471 U.S. at 476-77. As noted, Duke alleges that Defendants participated in a tortious scheme focused on Duke entities located in Houston. Based on Duke's allegations, which are taken as true for present purposes, Defendants should have reasonably anticipated being haled into court in Texas. Duke has established a *prima facie* case of personal jurisdiction over Peter Zinman, Edwards, and L.S. Belyea.

**H.   Venue**

The Japan Defendants argue that venue is not proper in this District. Plaintiffs pleaded that venue is appropriate under 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to Duke's claims occurred in this District. "The movant bears the burden of showing improper venue in connection with a motion to dismiss." *Rimkus Consulting Group, Inc. v. Balentine*, 693 F. Supp. 2d 681, 689 (S.D. Tex. 2010) (Ellison, J.) (citing *Texas Marine & Brokerage, Inc. v. Euton*, 120 F. Supp. 2d 611, 612 (E.D. Tex. 2000) (citing *Time, Inc. v. Manning*, 366 F.2d 690, 698 (5th Cir. 1966)). "In meeting this burden, the movant must show facts that will defeat a plaintiff's assertion of venue." *Id.* As discussed, Duke alleges that Defendants formed a partnership with Artale, a company with its principal place of business in Houston, whereby Napoli, an individual working for both Artale and Duke in Houston, would influence Duke entities, also with their principal place of business in Houston, to purchase a power plant at an inflated price. The Complaint additionally alleges that Torre was an officer of the Houston-based DEI, and that both Napoli and Torre (in furtherance of the alleged scheme) participated actively in pertinent meetings with Duke in Houston to influence Duke to purchase the plant at the purchase price.[48] Duke also alleges, *inter alia*, that Defendants were in communication with Napoli in Houston during Defendants' negotiations with Duke and that Napoli provided

---

[48]     *See* Complaint, ¶ 39.

Defendants with inside information on Duke's perspective on the deal during this time.  Simply put, Duke has alleged ample facts to establish that a substantial part of the events or omissions giving rise to Duke's claims occurred in this District.  Venue is appropriate under 28 U.S.C. § 1391(a)(2).

## I.     **Claims Against Gas Turbine**

The Japan Defendants move to dismiss Gas Turbine as having nothing to do with the case.  These Defendants contend that Duke has not alleged any specific acts by, or financial benefit to, Gas Turbine other than as part of an "undefined tandem of Japan/Gas Turbine."[49]   However, in addition to alleging that Gas Turbine was a member of Defendants' partnership with Artale, Duke specifically alleges that Peter Zinman, Michael Zinman, and Michael Napoli were all employees/directors/owners of both Japan *and* Gas Turbine, and that these individuals were key participants in acts giving rise to this lawsuit.[50] The Japan Defendants do not deny that the Complaint contains detailed allegations regarding the activities of these individuals. Accordingly, the Court cannot conclude at this juncture that Duke cannot state a claim against Gas Turbine.[51]

---

[49]    Japan Defendants' Motion, at 11.

[50]    *See* Complaint, ¶ 48.

[51]    Furthermore, many emails relevant to this suit were sent from Gas Turbine email
(continued...)

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Motions are **granted** to the extent that Duke's unjust enrichment claim and statutory claim under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. GEN. STAT. § 75-1.1, are **dismissed**. Defendants' Motions are in all other respects **denied**.  It is therefore

**ORDERED** that the Motions to Dismiss filed by the Japan Defendants [Doc. # 113], the Belyea Defendants [Doc. # 112], and Wabash [Doc. # 116] are **GRANTED in part** and **DENIED in part**.

SIGNED at Houston, Texas this **21**st day of **September, 2010**

_____
Nancy F. Atlas
United States District Judge

---

[51]      (...continued)
accounts.  Also,  Japan and Gas Turbine have the same ownership, address, and a substantial overlap of employees.